(Decided January 21st, 1863.)

THE STATE OF MARYLAND, AT THE RELATION OF CATHARINE M. MCCLELLAN, *vs.* JOHN J. GRAVES, CITY COLLECTOR OF BALTIMORE CITY, AND OTHERS.

The act of opening, widening and closing streets, is an exercise of the right of *eminent domain*, delegated by the Legislature of the State to the city, as also to other corporations, to be used for purposes of public good. To subordinate it to any private end, would be a perversion of the highest prerogative known to constitutional government.

The modes in which this power is exerted, vary according to circumstances. Sometimes it is initiated by summoning a jury upon warrant, in the nature of an inquest *ad quod damnum;* at others, boards of assessors are appointed to appraise dues and benefits, with the right of appeal to a court of record, and of review by a jury; yet all are subject to the constitutional inhibition, "that the Legislature shall enact no law authorizing private property to be taken for public use, without just compensation (as agreed upon between the parties, or awarded by a jury) being first paid or tendered to the party entitled to such compensation.

The constitutionality of the Act of 1838, ch. 226, and the ordinance of the city of Baltimore, of 1850, No. 17, entitled "An ordinance to provide for exercising certain powers vested in this corporation in relation to streets," has been repeatedly affirmed by this Court.

Not only the assessment by commissioners, with the right of appeal to the Criminal Court of Baltimore city, but the assessment of benefit dues on the proprietors benefited, is established as a constitutional mode of providing compensation to owners of land taken for public use.

State, Relation of McClellan, *vs.* Graves, *et al.*

The commissioners for opening and widening streets, having a special public duty and jurisdiction assigned them, to be executed in a prescribed form, their proceedings are of a legal character, and must be regarded as subject to all the incidents of proceedings, in the nature of a writ or inquisition "*ad quod damnum*," being but means to the same end.

The dedication of private property to public use, is not complete until the proprietor is paid or tendered the value of his property, as ascertained by the inquest or assessment. No preliminary step prior to actual payment or tender so fixes the corporation, as to prevent an abandonment of the condemnation or of the enterprise.

Persons dealing with commissiouers, for property or materials partially appropriated to the public use, deal with them as public officers, acting under the municipal councils, which have the power and the right to abandon any projected improvement, when it becomes obvious it will not promote the public good.

Regarded in their legal character, the proceedings of the commissioners under the ordinance of 1850, are a substitute for the inquisition of a jury, to ascertain the actual cost of any projected improvement, and have no further effect.

If the Courts will not coerce a corporation to adopt the condemnation at the instance of the proprietors, who are unwilling vendors, they would not, at the instance of purchasers buying an imperfect title, with full knowledge of the facts.

The proposition that any purchaser under such proceedings, can compel a corporation to persevere in the prosecution of what, in the judgment of its legally constituted directors, is detrimental to the community they represent, is so bold and momentous as to require the highest judicial authority to maintain it.

The Mayor and City Council are but trustees of the public; the tenure of their office impresses their ordinances with liability to change. They could not, if they would, pass an irrevocable ordinance. The corporation cannot abridge its own legislative powers.

The writ of *mandamus* is a summary remedy for the want of a specific one, where there would otherwise be a failure of justice; it is based upon reasons of justice and public policy, to preserve peace, order and good government; it is compared to a bill in equity. Not a writ of right, it is granted not as of course, but only at the discretion of the Court to whom the application is made, and this discretion will not be exercised in favor of applicants, unless some just or useful purpose may be answered by the writ.

APPEAL from the Superior Court of Baltimore city.

This is an appeal from an order of the Superior Court of Baltimore city, discharging a rule which, upon the petition of the appellant, had been laid upon the appellees, to show cause why a mandamus should not issue to compel them to proceed in the opening and widening of Holliday street, in the city of Baltimore. The case presented by the petition and answer is stated in the opinion of this Court. Prior to the passage of the order from which the appeal was taken, the following opinion was filed in the Court below, by MARTIN, J.:

As the ordinance of the Mayor and City Council of Baltimore, of the 21st of October 1858, for widening and opening Holliday street, was passed in pursuance of the power vested in the corporation by the Act of the General Assembly of Maryland of 1838, ch. 226, in relation to the streets of that city, and was the delegation on the part of the State to the corporate authorities of local legislative powers, granted to the corporation in its political capacity, for public purposes, the right to repeal that ordinance, and thus arrest the improvement at any stage of its progress, necessarily belonged to them as an incident to their legislative power. *Wilcox on Corp.*, 57. And whether the public welfare and convenience required, under all the circumstances connected with the proposed improvements, that the street should be widened and opened, or whether if it had been opened it should be closed, was a question exclusively within the province of the Mayor and City Council, and their judgment upon this subject could not be revised by the Court. *Hill vs. County Commissioners of Worcester*, 4 *Gray*, 415.

It cannot be denied that those who became purchasers of property from the Mayor and City Council, within the lines of the said street, did so under the promise and expectation that the street would be widened and opened, and that they

45      v.19

have been materially injured by the repeal of the ordinance and the discontinuance of the contemplated improvement; this is also the condition of those who have been assessed for benefits.

But the principle · is well established, that the power vested in the Mayor and City Council, in relation to the widening, opening and closing of streets, by the Act of the General Assembly of Maryland, 1838, ch. 226, is to be treated as a local legislative power. *Goszler vs. Corporation of Georgetown,* 6 *Wheaton,* 597. *State vs. Clarke,* 1 *Dutcher,* 55. *Western Savings Fund Society vs. City of Philadelphia,* 7 *Casey,* 182. *Graff vs. Mayor & City Council,* 10 *Md. Rep.,* 545. *M. & C. C. of Balt. vs. State, rel. of Board of Police of Balt.,* 15 *Md. Rep.,* 376. *Moodley vs. Morton,* 1 *Brown's C. R.,* 412. *Presbyterian Church case,* 5 *Cowan,* 540. And assuming this proposition to be correct, it is clear that the Mayor and City Council has no power, by any contract or covenant, or by any ordinance, by-law or resolution, to restrain or abridge its own legislative capacities, or to disable the then existing Mayor and City Council, or those who might succeed them, from passing an ordinance for closing, and if so, from arresting, by the repeal of a former ordinance, the progress of any work while in *fieri,* commenced for the purposes of widening and opening a street which in their judgment, in the then condition of things, the public welfare and convenience did not require to be widened or opened.

In the case of *Goszler vs. Carporation of Georgetown,* 6 *Wheaton,* 597, the Supreme Court, in reference to the power of the Corporation of Georgetown to alter the graduation of streets, says: "One object of the ordinance probably was, to give as much validity to the graduation made by the commissioners as if it had been made under the direct superintendence of the corporate body. But it cannot be disguised, that a promise is held forth to all who should

build on the graduated streets, that the graduation should be unalterable. The Court, however, feels great difficulty in saying that this ordinance can operate as a perpetual restraint on this corporation. When a government enters into a contract, there is no doubt of its power to bind itself to any extent not prohibited by its constitution; a corporation can make such contracts only as are allowed by the acts of incorporation. The power of this body to make a contract, which should so operate as to bind its legislative capacities forever thereafter, and disable it from enacting a by-law which the Legislature enables it to enact, may well be questioned. We think the corporation cannot abridge its own legislative powers."

I think, therefore, that the Mayor and City Council had the right, by the ordinance of the 15th of April 1861, to repeal the ordinance of the 21st of October 1858, and that although the ascertainment of benefits and damages by the commissioners, as corrected on appeal by the inquisition of a jury, which has been confirmed by the Criminal Court of Baltimore, is conclusive as to the amount of benefits and damages, it creates no obligation on the part of the city to proceed with the widening and opening of Holliday street, and that conceding all the facts stated in the petitions to be true, they furnish no ground for the granting of the writ of mandamus, as prayed for.

The cause was argued before BOWIE, C. J., and BARTOL and GOLDSBOROUGH, J.

*C. F. Mayer* and *Wm. Schley*, for the appellant:

I. As to the remedy: *Mandamus* is the proper and only remedy. The asserted right of the petitioner is a specific legal right, namely: to have Holliday street widened and opened. It can be attained only by *mandamus.* A bill for specific performance against the city, would not lie to

enforce and effectuate what we thus specifically claim. The city does not collect the sums assessed for benefits; this appertains to the office of collector. The city does not advertise for sale nor sell property so assessed on default of payment; this also is the duty of the collector. The city has no function to discharge in relation to the work now alone remaining for creating this new thoroughfare; and *qua corporation* the city has no concern with that work. The corporation does not actually open streets. That practical office is performed by the Board of Commissioners. *Mandamus* is a legal remedy, as much as would be an action for damages if applicable here, and our direct and natural remedy for our right; and as a legal remedy, not merely conditionally and alternatively allowed, as is the case with equitable jurisdiction, which is admitted only, provided the common law furnishes no complete and adequate remedy. *Tapp. on Mand.*, 19, 22, (76 *Law Lib.*) There is no other proceeding at law but *mandamus*, nor any in equity, that could give the proper relief. And the writ is properly to be directed to the parties who are ministerially to act. Thus in *Kendall vs. U. S., Relation of Stokes*, 12 *Peters*, 537, the writ was directed to the person who was to do the specific act, which the applicant for the writ was entitled to have done. The corporation was not a necessary nor even a fit party here. The Court acts *per directum*. *Tapp. on Mand.*, 16, 68. *Queen vs. Mayor, &c.*, 2 *Salk.*, 436.

In this case, the powers of the collector, of the street commissioners, and of the Appeal Tax Court as street commissioners, have not in law been taken away, but they refuse to exercise their powers in this case, because of the professedly repealing ordinance. And if that ordinance be unauthorized and void, as the appellant maintains, those officers are without justification or excuse for neglecting to do the acts necessary to be performed by them, in order to the enjoyment by the petitioner of her legal right to have

the street widened and opened, and her purchase respected and made available.

The final action on the assessment in the Appellate Criminal Court, upon the jury's verdict, made the assessment virtually a judgment operating under the express terms of the ordinance of 1850, as a lien on the property charged for benefits, and so operating in favor of those entitled to the damages assessed. The *mandamus* was consequently as appropriately, and we may say, as exclusively our resource for the benefit of the assessment, and of our virtual judgment, as *mandamus* is the only remedy to compel a sheriff to execute an ordinary judgment for debt, under a writ of *fieri facias* in his hands upon that judgment. *Rex vs. Barker*, 3 *Burr.*, 1267, adopted in the case of *Harwood vs. Marshall*, 9 *Md. Rep.*, 97. *Marbury vs. Madison*, 1 *Cr.*, 149. *Kendall vs. U. S.*, &c., 12 *Peters*, 537. *Rex vs. Commissioners*, &c., 5 *Adol. & El.*, 804. *N. Y. Life Ins. Co. vs. Flack*, 3 *Md. Rep.*, 341. *Thomas vs. Owens*, 4 *Md. Rep.*, 189. *Board of Commrs. vs. Aspinwall*, 24 *How.*, 383. *Com. of Ky. vs. Dennison*, 24 *Howd.*, 97. *Seward's Adm'r vs. Spedden*, 5 *Md. Rep.*, 433. *Commrs. of Wash. Co. vs. Nesbitt*, 6 *Md. Rep.*, 468. *Marshall vs. Howard*, 7 *Id.*, 466. Same case in 9 *Id.*, 83, 97.

II. As to the right of the petitioner to the specific action prayed for: The ordinance for widening Holliday street, and the proceedings had under it before the passage of the repealing ordinance, deprived the city of the right to legislate against the improvement, whether by repeal or other interference.

The street was then effectively open. It could, if so assumed to be open, be closed (or the execution of the improvement arrested by that process or device) only by pursuing the course provided by the Act of 1838, ch. 226, for closing streets in Baltimore; and by an assessment for the damages that might be proper to be awarded to property

owners for loss from closing the street, just as had been practised in this case (under the Ordinance of 1850, April 30th—Revised Ordinances No. 17, p. 45) for the opening, widening and extending of Holliday street. The Act of 1838, ch. 226, prescribes a notice in newspapers for at least sixty-days, of an application or proposal for closing a street, before any action on the subject can be had by the city. It may be remarked, that this Act is the source of all the city's power to open, widen, extend or close streets in Baltimore, and that the Ordinance of 1850, providing for indemnification for property taken, and for damages from the measures, was passed under the authority of this Act of Assembly, and as the requirement of the Act, and as the condition of the city's exercise of power. The ordinance of 1850, sec. 12, enacts that all assessments for benefits shall, until they shall be paid, be liens upon the pieces of property respectively assessed. That section also provides, that with the assent of the parties entitled to damages, in regard to their pieces of property, the street may be opened over such property without awaiting actual payment of the damages.

For the satisfaction of assessment of benefits, the secs. 10 and 11 direct that the pieces of property shall be sold, if the assessments be not paid within six months from the time of the assessment being finally delivered to the Register of the city; and the sale is to be upon at least thirty days, and not more than six months' notice, in two Baltimore papers. Sec. 13 provides that any person, although not entitled to any parcel of ground assessed for benefits, may pay the assessment on it, and shall thereby have vested in him the lien given by sec. 12, for the assessment upon the particular parcel of ground. Sec. 5 of the Ordinance also provides that those having assessments for benefits to pay, may pay with assessments of damage claims; and this privilege, for such occasions, is even more fully ex-

pressed in the Ordinance No. 11, sec. 15, (of the Revised Ordinances of 1850,) relating to the duties and powers of the City Collector.

It will appear to the Court, that from the 21st of October 1858, the day of passing the ordinance opening Holliday street, to the 15th of April 1861, when the ordinance of attempted repeal was passed, the owners of property affected by the opening, widening and extension of Holliday street, and embraced in the assessment,—whether for benefits or for damages,—were debarred the disposing power of their estate, and were even unable to derive a full income from it in rents, as no one could become tenant with certainty of occupation for any particular period,—a disadvantage peculiarly great with the property involved in this improvement, as it is in a part of the city occupied exclusively for business purposes. Their *jus disponendi* was definitively superseded by the ultimate assessment in the Court, and they were bound to surrender their property as sold to the public on payment, as limited by the adjudged assessment, and to be paid for by those assessed for benefits, as if they were vendees; the damaged parties (entitled to receive) being, on the other hand, virtual vendors, limited in their prices by the assessment. A binding relation of contract is thus created between the two classes, the benefited and the damaged,—the sanction of which is emphatically impressed and confirmed by the protracted dedication of the property concerned, from the date of passing the ordinance for the improvement, to the day of the finally adjudged assessment.

We discuss this question of right of the petitioner, as a right vested by force of all that has occurred under the Holliday street ordinance, and as one protected by the constitutional provision, which forbids the "impairing of the obligation of contracts," against any operation whatsoever of the ordinance of the attempted repeal. And this right,

we maintain, is inviolable as a *vested one*, not only because of the appropriation, indefeasibly although adversely made of the real property involved, and of the payments for the interests in the estates assessed as damaged, as much so as if contracts of actual and formal sale were under consideration,—but because, too, the assessment confirmed as we have described it, was to every legal effect a judgment with every incident, in lien, and in right of enforcement by a sale of estate, of an ordinary judgment of a Court. A judgment claim is just as much a vested interest as a right to a piece of real property. *Harrington vs. County Commissioners, &c.*, 22 *Pick.*, 263.

This dedication thus definitive of the property, and this indissoluble implication of interests of the damaged and the benefited proprietors reciprocally, and the actual payments for the interests damaged and yielded, distinguish this case from those in which, as in *Graff's* and *Nesbitt's* cases, only a preliminary and provisional investigation for ultimate optional action had taken place in the assessment for damages, for improvements that had the privilege of the "*eminent domain*" to ensure their execution, although prompted by private enterprise and redounding immediately to only individual profit.

We do not contend that general legislative power can be foregone by any Acts of ordinary legislation, however perpetual and unchangeable, by the terms, the provisions may be. But an Act of legislation may constitute a contract, or be founded on a consideration which creates, through the Act, a contract; or a contract may ensue either with the State or between individuals, in the sequel of execution of an Act of legislation. In such cases no general legislative power can sanction the repeal of the original Act. An Act of legislation may be a grant, and avail as if a testimonial under Executive signature and the seal of State. So it is with the Acts of legislation just instanced. And

such is the predicament and bearing of the Holliday street ordinance.   As to it, the corporation, as to general legislative control of it, became *functus officio* before the repealing ordinance was passed.

We have already intimated that the repealing ordinance cannot serve as the device of "closing" the projected street. We have shown that for that, notice to the public, and an award for benefits and damages in regard to the closing, are demanded by law.   The closing is an exercise of the right of the *"eminent domain,"* and a virtual taking of property for public uses,—impracticable without indemnification for the deprivation of the street sought to be "closed."

The repealing ordinance, assuming to reverse the decision, imported by the Holliday street ordinance, that said improvement was demanded by the "public good," gives an idle and utterly inappropriate ground for the reversal and the repeal.   It looks to the pecuniary cost of the measure, a matter of merely individual concern, not of public relation.   5 *Gill*, 383, *Alexander & Wilson vs. City.*   If the efficacy of the ordinance of repeal were to be judged by the reason on which it founds itself, it must be treated as a nullity *per se.*

Under this head of our vested rights, and the legislative impotency of the city for any repeal or subversive control of the ordinance opening Holliday street, and to nullify all that had irrevocably been transacted under the ordinance, we shall refer to the following authorities:   *Meth. Prot. Ch. vs. Mayor & C. C. of Balto.*, 6 *Gill*, 391.   *Mayor & C. C. of Balto. vs. Board of Police of Balto.*, 15 *Md. Rep.*, 462.   *Alexander & Wilson vs. City*, 5 *Gill*, 383.   *W. & S. Rail Road Co. vs. Condon.* 8 *G. & J.*, 443.   *Hamilton vs. A. & E. R. Rail Road Co.*, 1 *Md. Rep.*, 567, 525, 540. *Harrington vs. County Commissioners, &c.*, 22 *Pick. R.*, 263. *King vs. Hungerford Market Co.*, 4 *Barn & Ad.*, 327, (24

46     v. 19

*Eng. C. L. R.*, 68.) *Balto. & Susq. R. Co. vs. Nesbit*, 1 *Amer. Railw. Cases*, 47, (*note.*) *Buckinshaw vs. Birm. & Oxf. R. Co.*, 4 *Eng. L. & E.*, 489. *Huidekoper's Lessee vs. Douglass*, 3 *Cranch*, 70. *Fletcher vs. Peck*, 6 *Id.*, 135, 137. *State of New Jersey vs. Wilson*, 7 *Id.*, 166. *Terrett vs. Taylor*, 9 *Id.*, 50. *Bander vs. Snyder*, 5 *Barb.*, 64. *1st B. Ch. of Sch. vs. Sch. & Troy R. R. Co.*, 5 *Barb.*, 79, 80. *The People vs. Supervisors of Westchester*, 4 *Barb.*, 66. *Hampton vs. Coffin*, 4 *N. Hamp. R.*, 517. *Westbrook vs. North*, 2 *Greenlf. R.*, 179. *Doo vs. Lond. & Croyd. Railw. Co.*, 1 *Eng. Railw. & Can. Ca.*, 257. *Stone vs. Commercial Railw. Co.*, *Id.*, 375 and 400. *Tawney vs. Lynn & Ely Railw. Co.*, 4 *Id.*, 615. *Armstrong vs. Treasurer of Athens Co.*, 16 *Peters*, 289. 13 *How. R.*, 89, 90, 91, and cases from N. Hamp. and Connect., cited there by Judge Curtis. *Neptune Ins. Co. vs. Montell, Adm'r of Hughler*, 8 *Gill*, 228. *Bronson's Case*, 31 *Pa. Rep.*, 131, 132. Same case, 1 *How.*, 311. *Com. of Ky. vs. Dennison*, 24 *How. R.*, 97. *Board of Commssrs. of Knox Co. vs. Aspinwall*, *Id.*, 383. *Prov. Bank vs. Billings*, 4 *Peters*, 560. *McCullough vs. State of Md.*, 4 *Wheat.*, 368. *Green vs. Biddle*, 8 *Wheat.*, 92.

*I. Nevett Steele*, for the appellees:

1st. That the city of Baltimore is a municipal corporation, established for public political purposes, connected with the administration of the State Government; that the powers conferred upon the city by the Act of Assembly of 1838, ch. 226, in the exercise of which the ordinance for widening and opening Holliday street was passed, are local legislative powers, granted to it in its political capacity for public purposes; that its right to repeal the ordinance is a necessary incident to its legislative power; that the city has no power by any contract, express or implied, by ordinance or by the acts of its officers, "to bind its legislative capacities, or abridge its own legislative powers," conferred

upon it for public purposes; and, therefore, that even if the construction most favorable to the appellants, be placed upon the proceedings which have taken place under the ordinance to widen and open Holliday street, no contract can be implied from them, nor can any right of the appellants grow out of them, which would render the repealing ordinance invalid. *Mayor & City Council vs. Board of Police,* 15 *Md. Rep.,* 462. *Wilcox on Corporations,* 57. *State vs. Clarke,* 1 *Dutcher,* 55. *Western Saving Fund Society vs. Philadelphia,* 31 *Penn.,* 182, 183. *Bailey vs. Mayor, &c., of New York,* 3 *Hill,* 539, 540. *Moodalay vs. East India Co.,* 1 *Brown's Ch. Rep.,* 471. *Fairtitle vs. Gilbert,* 2 *Term Rep.,* 169. *Presbyterian Church vs. N. Y. City,* 5 *Cowan,* 540, 542. *Goszler vs. Cor. of Georgetown,* 6 *Wheaton,* 597.

2nd. That whether the public welfare and convenience required that the opening and widening of Holliday street should be proceeded with or be stopped, was a question under the Act of 1838, ch. 226, for the exclusive consideration of the Mayor and City Council, and could not be decided by the Superior Court. *Hill vs. Commissioners of Worcester,* 4 *Gray,* 415. In cases of discretion, the Courts will not issue the writ of *mandamus. Ang. & Ames on Corp.,* 713, 714. *Meth. Prot. Ch. vs. Mayor & C. C. of Balto.,* 6 *Gill,* 391.

3rd. That the ascertainment of benefits and damages by the commissioners, as corrected on appeal by the inquisition of a jury, confirmed by the Criminal Court of Baltimore, while it is final and conclusive as to the amount of damages and benefits, creates no obligation on the part of the city to go on with the proposed widening and opening of Holliday street. *Graff vs. Mayor & C. C. of Balto.,* 10 *Md. Rep.,* 545. *Balto. & Susq. R. R. Co. vs. Nesbitt,* 10 *Howard,* 395.

4th. That the assignments of damages by William McClellan, beyond the amount of benefits assessed against

him, are unauthorized by Ordinance No. 17, of 1850, and are of no effect; that the assignments made by him and the German reformed Congregation, in conformity with that ordinance, do not for all °purposes operate as present payments; that they are transfers of damages not yet suffered, as a set-off against benefits not yet conferred, made by the property owner at his option, for his own convenience; that the damages will never become due, or real, if the city does not take the property condemned, and the benefits will never be conferred if the street is never opened; that, therefore, if the property is not taken, and the ordinance providing for the contemplated improvement is repealed, there are, in truth, no damages or benefits, and thus the subjects of the transfers never come into existence; and that these transfers consequently operate, and were intended by the ordinance to operate as payments, only in the event of the projected improvement being carried into effect. Ordinance No. 17, of 1850, sec. 5, *Graff vs. M. & C. C.* 10 *Md. Rep.*, 545, *Stewart vs. M. & C. C.* 7 *Md. Rep.*, 500, 516, *M. & C. C. vs. Stewart.*

5th. That if these assignments of damages by Wm. McClellan and the German Reformed Congregation, are to be treated as if they were actual present payments in money of the benefits for which they were assessed, and if the other appellant, Catharine McClellan, is to be considered as having rightfully paid the benefits assessed against her, then all the appellants stand in the position of property owners, who have paid a tax imposed on them for public purposes, by an ordinance passed by the city, in the exercise of its legislative powers as an instrument of the government of the State; that such a payment of a tax imposed for public purposes, gives to the tax-payer the right to call upon the officers of the city to discharge their duties under the ordinance while it remains on the statute book, but creates no contract between him and the city that

the ordinance shall not be repealed. *Mayor & City Council vs. Green Mount Cemetery,* 7 *Md. Rep.*, 517. *Esbach vs. Pitts,* 6 *Md. Rep.*, 71.

6th. That the purchase by Catharine McClellan, at the sale held by the street commissioners, of the part of a lot of ground not needed for the bed of the proposed street, was a conditional purchase, dependent upon the city's going on with the proposed improvement, and that if it is to be treated as an absolute, unconditional contract for the purchase of a lot, it furnishes no sufficient ground for the issuing of a *mandamus* to compel the opening of the street. Ordinance No. 17, of 1850, sec. 7.

7th. That the purchase of property by William McClellan, upon the expectation that the street would be opened, gives him no right to ask for a *mandamus*. The purchaser has an action at law for breach of contract. *Harwood vs. Marshall,* 9 *Md. Rep.*, 84.

8th. Whatever are the rights of the appellants, as against the city of Baltimore, the *mandamus* was, under the circumstances of this case, properly refused; because the Courts ought not to grant the writ: 1st, where it would be nugatory, and no person would have power to execute it; 2nd, where it would subject those to whom it is directed to actions; 3rd, where it would be attended with hardship, would introduce confusion, and would be opposed to justice, good government and public policy. *Angel & Ames on Corp.,* sec. 698, 700. *Tapp. on Mand ,* 76 *Law Lib.,* 67, 68, 69. *Rex vs. Paddington Vestry,* 9 *Barn. & Cress.,* 457. 17 *E. C. L.,* 208, 215. *Rex vs. Mayor of London,* 2 *Term R.,* 181, 182. *King vs. Griffith,* 5 *Barn. & Ald.,* 731, 735, 7 *E. C. L. Rep.,* 398, 401. *Queen vs. Justices,* 9 *Adol. & El.,* 540, 36 *E. C. L. Rep.,* 291, 294. *Van Rensellaer vs. Sh'ff of Albany,* 1 *Cowen,* 501, 512. *People vs. Sup. of Westchester,* 15 *Barb.,* 607. *Bacon's Abr. Title "Man-*

*damus" E*, 443. *Harwood vs. Marshall,* 9 *Md. Rep.*, 84. *Stewart vs. Mayor & C. C.*, 7 *Md. Rep.*. 540.

Bowie, C. J., delivered the opinion of this Court:

The Mayor and City Council of Baltimore, by virtue of authority vested in them by an Act of the General Assembly, passed at December Session 1838, entitled, "An Act to vest certain powers in the Corporation of Baltimore, in relation to streets," on the 21st of October 1858, passed an ordinance to widen Holliday street, between Baltimore and Fayette streets, and to open a street, in continuation of Holliday street, to Exchange Place, and to change the name of Commerce street to Holliday street.

The Commissioners for opening streets were required to widen Holliday street from Baltimore to Fayette street, to conform to a new plat then filed in the Register's office, prepared by the City Surveyor, designated as the plat of the proposed opening and widening.

They were also required to condemn and open a street, in continuation of Holliday street, from the south side of Baltimore street to Exchange Place, to conform to said plat, and to proceed in all respects, in widening and in condemnation and opening of the street, in continuation of Holliday street, in accordance with the provisions of an ordinance entitled, "An ordinance to provide for exercising certain powers vested in the corporation, in relation to streets, approved April 30, 1850."

The Register and Collector of the city, were required to perform such duties in relation to streets, as are required of them by the provisions of the ordinance.

The Commissioners, in pursuance of this ordinance, advertised for sale at public auction, on the 31st January 1859, on the premises, *all the materials in the houses lying and being in the bed of Holliday street, as contemplated to be*

*opened,* and also portions of lots; the said houses and lots being referred to as numbered on the condemnation plat. The advertisement concludes as follows: "The purchaser or purchasers will be required to give bond in double the amount of purchase money, that the said purchase money will be *paid on the day the said Commissioners are prepared to give possession of said property and materials,* and that said purchaser or purchasers respectively will remove within sixty days thereafter all such materials so sold, and all rubbish occasioned thereby."

At this sale the relator, Catharine McClellan, purchased part of a lot No. 111, for $2,050, for which she gave her bond to the Mayor and City Council, conditioned to pay "on the day that said Commissioners are prepared to deliver to her all that piece or parcel of ground designated on the condemnation plat of Holliday street by the letter E." The relator also purchased materials in house No. 97, for which she gave her bond, conditioned as above.

The Commissioners proceeded to make their assessment of damages and benefits, which was returned to the Register of the city; and on the Register's proceeding with said return and report of Commissioners, as required by law, appeals were entered to the Criminal Court of Baltimore, by persons assessed for damages and benefits, and the return and report were transmitted to said Court for adjudication; where, by inquisition of a jury, they were reviewed and considered, and on the 11th of May 1860, finally confirmed.

On the 6th of October 1860, the assessment of the jury and judgment of the Court were transmitted to the Register of the city for his action,

Among other assessments for benefits, the lot purchased by the relator was assessed $345.55, of which she had the following notice:

State, Relation of McClellan, *vs.* Graves, *et al.*

"Folio—. CITY TAXES—1860.

WM. T. VALIANT, *City Collector.*

*Catharine M. McClellan,*

To the Mayor and City Council of Baltimore, Dr.

To benefits assessed on lot No. 111, opening Hol-

liday street, - - - - - - - $345.55

*October 8th,* 1860. *Received payment,*

GEO. M. FORD.

☞ If this bill be not paid on or before the 8th day of November next, an additional charge will be incurred for advertising notice to owners; and if it be not paid on or before the 8th day of April 1861, next, the above described property will be advertised and sold, in compliance with existing ordinances.

No.— BALTIMORE, *October 8th,* 1860.

BANK OF COMMERCE, pay to the order of W. T. Valiant, (Collector,) three hundred and forty-five $\frac{55}{100}$ dollars.

($345.55.) WM. W. McCLELLAN.

(Endorsed.) WM. THOS. VALIANT, *Collector,*

Per ROBERT C. BARNES, *Cashier.*"

On the 1st of April 1861, an ordinance to repeal the ordinance of the 21st October 1858, to open Holliday street, was introduced in the first branch of the City Council, and finally passed and approved on the 15th April 1861.

It will thus appear, from a comparison of dates, that about thirty months elapsed between the inauguration of, and the final abandonment of the projected improvement of Holliday street. During all which time the Commissioners were not prepared to deliver possession of the lot or houses purchased by the relator. And before the period arrived when property assessed for benefits would be liable to sale for default of payment, viz., 8th of April 1861, the repealing ordinance was introduced in the lower branch of the City Council, and finally passed and approved on the 15th of April 1861.

The act of opening, widening and closing streets, is an exercise of the right of *eminent domain*, delegated by the Legislature of the State to the city, as to other corporations, to be used for purposes of public good.

To subordinate it to any private end, would be a perversion of the highest prerogative known to constitutional government. The modes in which this power is exerted, vary according to circumstances. Sometimes it is initiated by summoning a jury upon warrant, in the nature of an inquest *ad quod damnum;* at others, boards of assessors are appointed to appraise dues and benefits, with the right of appeal to a court of record, and of review by a jury. Yet all are subject to the constitutional inhibition, "that the Legislature shall enact no law authorizing private property to be taken for public use without just compensation (as agreed upon between the parties, or awarded by a jury) being first paid or tendered to the party entitled to such compensation."

The constitutionality of the Act of 1838, ch. 226, and of the ordinance of the city of 1850, No. 17, entitled, "An ordinance to provide for exercising certain powers vested in this corporation, in relation to streets," has been affirmed by this Court, in the case of *Stewart vs. Mayor & City Council,* 7 *Md. Rep.,* 500; *Alexander & Wilson vs. Same,* 5 *Gill,* 383, and in other cases.

Not only the assessment by commissioners, with the right of appeal to the Criminal Court of Baltimore, but the assessment of benefit dues on the proprietors benefited, is established as a constitutional mode of providing compensation to owners of land taken for public use. The whole system, in fine, has the sanction of the highest judicial authority of the State. *Stewart vs. Mayor & City Council,* 7 *Md. Rep.,* 514. The Commissioners for opening and widening streets, having a special public duty and jurisdiction assigned them, to be executed in a prescribed form,

their proceedings are of a legal character, and must be regarded as subject to all the incidents of proceedings, in the nature of a writ or inquisition "*ad quod damnum,*" being but means to the same end.

The dedication of private property to public use, is not complete until the proprietor is paid or tendered the value of his property, as ascertained by the inquest or assessment. No preliminary step prior to actual payment or tender, so fixes the corporation as to prevent an abandonment of the condemnation or of the enterprize. *Graff vs. Mayor & City Council*, 10 *Md. Rep.*, 551. *Balt. & Sus. R. R. Co. vs. Nesbit*, 10 *Howard*, 395. Persons dealing with Commissioners for property or materials partially appropriated to the public use, deal with them as public officers, acting under the municipal councils, which have the power and the right to abandon any projected improvement when it becomes obvious it will not promote the public good. The purchase money for the property and materials lying in the bed of the projected condemnation, and sold to the relator, was to be paid on the day the Commissioners were prepared to give possession. They could not be prepared until the proprietors were paid, or the damages tendered. No title vested in the Mayor and City Council, until such payment or tender. By the terms of the contract, as evidenced by the advertisement, the purchasers were notified of the contingent character of the transaction, and bought an *inchoate* interest. The payment of the benefit dues assessed on the lot bought by the relator, did not in any way affect the title, but was only a part compliance with the terms of sale as between the Commissioners and the relator. The collection of any part or the whole of the benefits assessed, prior to the actual payment or tender to the proprietors of damages assessed, could not change the relation of the Mayor and City Councils to the proprietors.

The relator in this case, has no stronger claims upon the

consideration of the Court, than the petitioner in the case of *Graff against the Mayor & City Council of Baltimore*, 10 *Md. Rep.*, 551, the decision of which, based upon that of the Supreme Court, in the case of the *Balt. & Sus. Rail Road Co. vs. Nesbit*, 10 *Howard*, 395, seems to us conclusive and controlling.

After quoting the propositions established by the Supreme Court, viz., that the title to the land condemned did not vest in the company until payment or tender of damages, and that the proprietors could not coerce the company into the adoption of the condemnation, this Court proceeds as follows:

"Now, if the title does not vest in the city until payment or tender, and the owner could compel payment by legal process, there would be no mutuality. The city might be required to pay for land that it may never use or need for the purposes of the Act. This certainly would be a hardship on the citizens of Baltimore, from which we think they should be relieved, by adopting the interpretation of the Supreme Court in the case cited."

"This may be a severe system of legislation, as was said, because it places the property owner at the discretion, not to say the caprice, of the other party, by allowing it to condemn and afterwards abandon the property. But this construction is not likely to work so much injustice as that contended for by the appellant, because by the latter, the city is deprived of all choice of location after condemnation is once made and affirmed, no matter how great the necessity might be afterwards for adopting another, even if the owner of the land condemned had not sustained any damage by the act of the city in making the condemnation."

\*       \*       \*       \*       \*       \*       \*

"The Act of Assembly has not made the inquisition and confirmation obligatory on the city further than this, that they ascertain the damages to be paid. If there be injus-

tice in this, as alleged in the present case, the fault is in the law, and is not to be imputed to those who administer it." 10 *Md. Rep.*, 552, 553.

Regarded in their legal character, the proceedings of the Commissioners under the ordinance of 1850, are a substitute for the inquisition of a jury, to ascertain the actual cost of any projected improvement, and have no further effect.

If the Courts will not coerce the corporation to adopt the condemnation, at the instance of the proprietors, who are unwilling vendors, they would not at the instance of purchasers buying an imperfect title with full knowledge of the facts.

The *mandamus* in Graff's case, was to compel the Mayor and City Council to provide or procure funds for payment of his claims.

In this, the relator prays the Collector may be commanded forthwith to proceed to collect the benefit dues remaining unpaid, and those the amounts whereof he may, under the said ordinance for repeal, have refunded, and forthwith advertise for sale to satisfy said dues "as prescribed by the ordinance of 1850," etc., and in all respects proceed as if said ordinance of repeal had not passed; that the Commissioners or Appeal Tax Court proceed as if said ordinance of repeal had not passed, to do all duties and perform all services, and cause to be done all necessary work *in removing buildings and otherwise, for effecting the actual widening and opening of Holliday street, as required by said ordinance, as if said ordinance of repeal had not passed.*"

The petition proposes the Court should annul the ordinance of repeal, enforce the execution of the ordinance repealed, and compel the city to prosecute a work, the expense of which, in the language of the local Legislature, "is largely in excess of what was anticipated at the time

of passing the ordinance" repealed, and "greater than any public benefit from the opening and widening of said street as projected by the ordinance, and which will entail a large special tax on the community."

When it is remembered that the sale under which the relator claims, was required by ordinance No. 17, of 1850, sec. 7, to be made *before the Commissioners proceeded to assess the amount of damages and expenses;* that those were yet to be ascertained, and the consummation of the contract between the Commissioners and the vendees expressly depended upon the ability of the former to deliver possession, which could not be done until the proprietors were satisfied, that the Mayor and City Councils could not know the aggregate of expense until all the preliminaries prescribed by ordinance No. 17, of 1850, had been completed; the reasons for holding all these proceedings, as provisional and revocable, are obvious and irresistible.

The proposition, that any purchaser under such proceedings can compel the corporation to persevere in the prosecution of what, in the judgment of its legally constituted directors, is detrimental to the community they represent, is so bold and momentous as to require the highest judicial authority to maintain it. The sanctity of contracts is to be upheld and vindicated with the utmost vigilance. However high the contracting parties, none should be permitted to violate them with impunity. But the object and character of the parties entering into it, are elements of the contract, and limit its operation.

The Mayor and City Council are but trustees of the public; the tenure of their office impressed their ordinances with liability to change. They could not, if they would, pass an irrevocable ordinance. The corporation cannot abridge its own legislative powers." *Goszler vs. Corporation of Georgetown,* 6 *Wheat.,* 597. Their contracts, when consummated and within their chartered powers,

must bind them and their successors, whatever be the consequences.

It is a high exercise of judicial discretion, to determine when public policy, justice and good government require the specific execution of a contract made by municipal corporations, and to enforce the same by summary process. The writ of *mandamus* is a summary remedy, for the want of a specific one, where there would otherwise be a failure of justice. *Runkel vs. Winemiller,* 4 *H. & McH.,* 448. *Harwood vs. Marshall,* 9 *Md. Rep.,* 97. It is based upon reasons of justice and public policy, to preserve peace, order and good government. It is compared to a bill in equity for specific performance. *Ibid., Evans' Prac.,* 404. Not a writ of right, it is granted not as of course, but only at the discretion of the Court to whom the application is made, and this discretion will not be exercised in favor of applicants, unless some just or useful purpose may be answered by the writ. *Angel & Ames on Corp.,* sec. 698, and authorities there cited.

If this were, in form and in fact, a bill for specific performance, between individuals or private corporations, requiring the exercise of the ordinary powers of a Court of Equity in such cases, we cannot perceive in the allegations or evidence such circumstances as would entitle the relator to relief.

But when it is an application for summary proceedings against a great municipal corporation, with a local legislature, whose deliberate action it proposes to annul and set aside, and requiring private property to be appropriated to public use, against the expressed will of that public, highways to be opened, and buildings to be destroyed in a densely populated city, it does not present those conditions prescribed by the authorities, to entitle it to favor.

It would be perverting the great principle of social organization, to require the public good to be sacrificed for

the advantage of one or more citizens. If the relator is damnified by the failure of the city to execute its contract, she has an ample remedy at law for any loss she may have sustained. It does not follow, because the contract is not specifically enforced, the parties are released from its obligations.

There are some prominent points of this case, decided by the learned Judge below, which we have not enlarged upon. This opinion is so cogent, clear, comprehensive and well sustained by authorities, that it is unnecessary for this Court to do more than refer to it, as a sound exposition of the law, in which we entirely concur.

*Decree affirmed.*

(Decided January 22nd, 1863.)

NOTE BY REPORTER.—The cases of *The State, rel. of the Elders, Deacons and Trustees of the German Reformed Congregation of Baltimore Town, vs. John J. Graves, et al.*, and *State, rel. of William W. McClellan, vs. John J. Graves, et al.*, were argued jointly with the above. The points arising in the three cases being substantially the same, the decision in the above case applies to all of them.