# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed June 24, 1891.

SUSAN S. BALTZELL AND WILLIAM H. BALTZELL, TRUSTEES UNDER THE LAST WILL AND TESTAMENT OF JAMES R. PARTRIDGE,

VS.

THE BALTIMORE BELT RAILROAD COMPANY.

PHELPS, J.—

While it is not uncommon to hear cases spoken of as involving questions of great magnitude and importance,

scarcely once in a generation can it be said with truth of a particular decision that it marks a crisis in the jurisprudence of a State. Such a decision has been recently pronounced by the Court of Appeals of Maryland, in the case of Ulman vs. the Mayor and City Council of Baltimore, 72 Md. 587, expressly overruling four rent adjudications of the same Court, viz: Johns Hopkins Hospital case, 56 Md. 1; Scharf case, on a rehearing, 56 Md. 50, which itself overruled the same case as first decided, 54 Md. 499; Moale case, 61 Md. 224; Alberger case, 64 Md. 1. The new departure was put upon the absolute rights of man, as guaranteed by Magna Charta, the Maryland Declaration of Rights, and the Constitution of the United States. A more far-reaching judgment has seldom been recorded anywhere. The present case is its first revelation.

For, notwithstanding the extraordinary vigor of the effort on the part of the defendant's counsel to wrest this case from the grasp of that adjudication, the result of careful examination has been to show that, while there are marked differences of detail, there is no substantial distinction of principle.

The leading case referred to was the case of a municipal assessment levied upon the property of a taxpayer under a street paving ordinance. The ordinance made no provision for notice to and hearing of any proprietor for whose land adjoined the street, upon the question what proportion of the tax should be assessed upon his land. This municipal legislation was held repugnant to organic law, because it resulted in the imposition of a lien, and therefore *in effect* took the property of the individual without due process of law, without giving him an opportunity to be heard. In other words, that case decides that an indirect taking of private property for a public use, under the taxing power, in order to be due process of law and therefore valid, must be by virtue of a law requiring notice to be given to the owner.

The case in hand is not a case of an indirect taking under the taxing power but it is a case of a direct taking without circuity of intervening lien under the power of eminent domain. The same principle held applicable to an indirect taking would seem to be even more plainly and more forcibly applicable to a direct taking. If the statute under which the condemnation is sought to be effected altogether fails to prescribe notice to the owner and to give him opportunity to be heard, it would seem impossible to escape the conclusion that the process is not due process of law, and that the statute is for that reason repugnant to organic law.

It therefore becomes necessary to determine at the outset precisely the character of the statute in controversy. Code, Article 23, Section 167. It is the more necessary, since there runs through much of the argument in its support a thread of suggestion or assumption that the statute does in effect provide a notice, reasonable under the circumstances, and does in effect provide all the opportunity to be heard that should in reason be expected. Two features of the process are relied upon in this connection, the preliminary treaty with failure to agree, and the actual entry of the sheriff's jury upon the very land. It is claimed, and claimed with truth, that no such features are to be found in the process found objectionable in the tax assessment cases. In those cases, it is said, the whole process is done on payer, in an office. Here, there must first be the actual approach to the owner, and a failure to agree equivalent to a warning of what is going to be done. And next we have the entry on the land as public and notorious as livery of seizing at common law.

Does this reasoning bear investigation? To begin with, it loses sight entirely of the *infant*, the *feme covert*, the *non compos*, the non-resident or the owner who for any cause may be legally incapable of contracting. It loses sight also of the owner, actually competent and resident, who may be temporarily absent "when such property may be wanted." The act requires no attempt at an agreement with the guardian, the husband or trustee, the committee, the agent or the representative. So far as the rights of all helpless and incapacitated persons are concerned there is absolutely no attempt at their recognition, in any way, by any word.

In the next place, as to the competent persons who are actually to be negotiated with, and who are thus supposed to be sufficiently warned, let us see what may, by the authority of the statute, be done under it in practice.

The railroad agent sees the owner and makes him an offer, which is declined. The agent, or at all events the law itself then informs him that the proper steps may be taken to condemn. The owner asks, "When?" The agent says, "That is our business." The owner wants to know how he is to be notified. "You will see the jury on the land." The owner suggests the personal inconvenience to himself of picketing the particular locality for an indefinite period, with all the chances of the company changing the route. He also suggests the importance of his knowing a day or two beforehand of the precise time appointed for the meeting of the jury on the land, so that he can be there himself and have a few witnesses on hand. The agent then replies to him and says with truth, if this statute be valid, *"The law gives you no such right."*

It is urged that whether there be due notice or not, there is at all events the opportunity to be heard. So far as the express terms of the act reach, the party, if present, is permitted to strike four jurors from the panel of twenty. It is to be implied that the owner may except to the confirmation of the inquisition in Court. No notice is required to be given of the inquisition in railroad cases, although such notice is required in all other cases. Code, Art. 23, Sec. 251. Whether there be fair opportunity to be heard depends upon the sufficiency of the notice.

It should in fairness be admitted that the actual practice under this class of statutes has generally been more liberal than their terms require. To a thoroughbred lawyer nothing is more distasteful than an ex parte trial, and great corporations are compelled by their own interest to take their counsel from that class. It is believed that as a rule, corporation attorneys, true to their professional instincts, have observed the obvious requirements of justice and decency, and the constitutional right of the parties interested, and thus voluntarily and as a matter of grace, supplemented the law. To such an extent has this been true that the giving of notice has become a recognized rule of practice in such cases.

2 Poe, Sec. 769.

Mayor vs. Ritchie, 51 Md. 243, 4.

But the question is not what is done outside of the statute, but by it. "The constitutional validity of law is to be tested, not by what has been done under it, but by what may by its authority be done."

72 Md. 596, citing from the opinion of Earl, J., in Stuart vs. Palmer, 74 N. Y.:

"It is not enough that the owners may by chance have notice, or that they may, as a matter of favor, have a hearing. The law must require notice to them, and give them a right to a hearing and an opportunity to be heard."

Stuart vs. Palmer, 74 N. Y. 183. Cited in Scharf case, 54 Md. 518.

"Much of the opinion in that case (Stuart vs. Palmer, 74 N. Y.) applies with great force to statutes and proceedings under which property is taken by the right of eminent domain."

Miller, J., in Johns Hopkins Hospital case, 56 Md. 30.

As to what is due notice in condemnation cases, we have examples at hand in numerous statutes *in pari materia* requiring notice. A type of this class may be found in the act enabling the City of Baltimore to condemn land for the purpose of its water supply. We find there the same provisions about the failure to agree and the entry of the jury upon the land, but in addition twenty days' notice of the day for the meeting of the jury is required to be given to the owner, or person interested, "or if any owner be an infant or lunatic or *feme covert* to his or her guardian or husband, or left at his or her place of abode, or if out of the State or unknown such notice shall be published, &c."

1853, Ch. 376; P. M. L., Art. 4, Sec. 918.

In the same connection we find a noteworthy statute providing for condemnation by the United States for government purposes. Here, at two stages of the process, two different notices are required. The first is a notice by publication, containing a description of the land wanted and the names and place of residence of the owners, and is designed to furnish an opportunity to contest, in Court, the necessity or propriety of the proposed condemnation. The second is an actual notice of five days to be given to the owner, reputed owner or agent, of the day named for the meeting of the jury upon or near the land.

1874, Ch. 395, Code, Art. 96, Secs. 8, 9.

Substantially similar provisions for notice, generally accompanied by provisions for a trial by jury upon appeal, may be found in the public general laws for condemnation of roads, public and private (Art. 25, Secs. 84, 86, 88, 113, 117). In the public local laws for condemnation in Baltimore City of streets (Art. 4, Sec. 806), sewers (Sec. 794), and markets (Secs. 680, 682), for condemnation in Baltimore County of roads (Art. 3, Sec. 201), and streets, Sec. 226, and for like condemnations in most of the other counties of the State.

There may also be found in several counties exceptional condemnation acts for particular towns in which the customary provision for notice has been omitted, and one notable instance of that kind in the case of park condemnations in Baltimore City (Art. 4, Sec. 710).

Many years ago it was observed, in a different connection, that our legislation is continually deformed by local or partial enactments at war with the symmetry of the whole system."

McMahon Hist. of Md., 103.

Making all due allowance for such irregularities, it may be laid down as a general proposition that the right of eminent domain in Maryland, when exercised in the interest of the public, as for the purposes of the government of the United States, or of municipal agencies, is exercised under statutes expressly requiring notice to the land owner of the proposed condemnation. The statutory notice provided for is fair, adequate and sufficient, giving the owner reasonable opportunity to appear, summon his witnesses, strike the jury and be heard. By those public statutes no proceeding is tolerated of an ex parte character, no advantage can be taken of the helpless or the absent, and no opportunities are afforded for surprise.

When we compare with these impartial enactments the one sided provisions of the statute in controversy, the contrast is impressive. And when we realize the fact that under this statute it is possible for any five persons to incorporate themselves by certificate into a railroad company, armed with the sovereign power of eminent domain, unlimited by the just restrictions imposed upon public agencies, we have at least begun to form the conception of what is and what is not due process of law.

But it is unnecessary to dwell longer upon this topic. The statute does not make the land owner a party to the proceeding to take away his property, either actually, constructively or by representation. The statute does not require notice, nor does it require opportunity to be heard. That appears from an analysis of its contents, from collation and contrast with other statutes *in pari materia*, and moreover, it has been so decided.

W. M. R. R. Co. vs. Patterson, 27 Md. 135.

George's Creek Co. vs. New Central Co., 40 Md. 438.

It is argued that the tax assessment cases were proceedings *in personam*, while this is a proceeding *in rem*. It is not necessary to decide whether or not the entry upon the land of the sheriff and jury for view and valuation only, without seizure of the land, and without taking it into custody of the Court, answers to the technical description of a proceeding *in rem*. It is only necessary to say that, regarded even as such, there is here no process of publication or monition, without which there can be no valid condemnation.

Windsor vs. McVeigh, 93, U. S. 278, 279.

Sabariego vs. Maverick, 124 U. S. 292, 3.

And in the tax cases it has been decided that the process therein resulted in "a judgment *in rem* and *in personam*."

72 Md. 591, 56 Md. 45.

These preliminary questions being disposed of, we come to the main line of defence. This position practically concedes the *ex parte* character of the procedure, and justifies it upon the ground of settled usage. Its origin is traced in England to the common law writ of *ad quod damnum*, which was at an early day introduced into the province of Maryland, and was incorporated into the legislation of the province and afterwards of the State. The procedure is therefor claimed to answer exactly to the description of due process of law as laid down by the Supreme Court of the United States.

"To what principles then are we to resort to ascertain whether this process enacted by Congress is due process.

To this the answer must be two-fold. We must examine the constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country."

Murray's Lessee vs. Hoboken Land Co., 18 How 276.

The writ of *ad quod damnum* seems to have become obsolete in England in Blackstone's time, since we find but a faint trace of it in his Commentaries 2 Bl. Com. 271 and an inadequate reference to it in Reeves, 2 Reeves Hist. Eng. Law, 534, Ch. XI. It is not mentioned in Tidd's Practice or in Chitty's General Practice.

For a proper understanding of its place in English law and history, it is necessary to recur to the statutes of Mortmain, and to such old books as are cited below.

Primarily the writ was used in connection with alienations in Mortmain. It was necessary to obtain the King's license before any grant could be made to a religious use or to a corporation, and before the license could issue, the sheriff was ordered to inquiry by oath of good and lawful men whether it would be to the damage of the King or of others. Alienations by the "king's tenant" also required his license, and the issuing of the writ. The same proceeding then came to be extended to the condemnation of private property for public purposes under the eminent domain. The proceedings under this writ were wholly *ex parte*.

Fitz N. B., 509, &c.

Termes de la Lev, 15.

Reg. Brev., 247, 255.

The foundation for the introduction of the writ of *ad quod damnum* into the province of Maryland was really laid by Lord Baltimore in 1648. In his "Conditions of Plantation," all corporations were excepted; they were declared incapable of holding land, and all alienations contrary to the English statutes of Mortmain were prohibited without special license "under his lordship's hand and seal at arms."

Arch., Md. P. C., 1636, 1667, p. 227.

In order to obtain this license doubtless the same proceeding was resorted to as to obtain the king's license in similar cases in England. At all events, we find the writ of *ad quod damnum* distinctly introduced in the act of 1669 "for the encouragement of such persons as will undertake to build water mills."

Laws, Liber C. & W. H., fol. 179.

Md. Hist. Soc. Book 60.

This act having expired by its own limitation was revived by 1704, Ch. 16. The form of the writ and proceeding under this act in 1722 will be found in Pressly's case, 3 Bland 391. Similar proceedings in 1763 and 1764 may be found referred to in

Adams vs. Brereton, 3 H. & J. 124.

Gwynn vs. Jones, 2 G. & J. 173.

The act was repealed by 1766, Ch. 10.

Upon the model of this ancient writ were undoubtedly framed the earliest condemnation acts passed in this Province. These acts contained no provision for notice of any kind to the proprietors whose lands were to be taken. In some of them the valuation was to be made by a sheriff's jury of inquisition, in others by commissioners, assessors or freeholders. Such acts have been recognized as the legislative substitute for the common law writ.

Bellona Co., 3 Bland 442.

Compton vs. Susquehanna R. R., 3 Bland 390.

C. & O. Canal Co. vs. Bank, 4 Cranch C. C. 75.

State vs. Graves, 19 Md. 351.

To this ancient origin is undoubtedly to be ascribed a series of *ex parte* condemnation acts, which have been passed from time to time in Maryland ever since, and of which the statute in controversy is one of the latest examples. Of this class of enactments the charters of the Chesapeake and Ohio Canal Co. (1824, Ch. 79) and of the Baltimore and Ohio R. R. Co. (1826, Ch. 123), are perhaps the most notable illustrations. Many other internal improvement companies have had similar provisions in their charters.

It is further claimed on behalf of the company that not only have statutes prescribing this process as the process of law for the exercise of the eminent domain been in force for two centuries in the province and State of Maryland, but they have been so under the provisions of Magna Charta, and after-

wards under the Maryland Declaration of Rights, in effect the same as the fourteenth amendment. Furthermore, the process prescribed by the charter of the Potomac Company, 1784, ch. 33, and of other corporations containing the like provision for the exercise of the eminent domain, has been in force within the District of Columbia almost since the adoption of the Federal Constitution, under the provision of the fifth amendment, which is exactly that of the fourteenth amendment, though a limitation only on the powers of the National Government. The process of condemnation prescribed in these charters, although *ex parte*, has been repeatedly recognized both by the Courts of this State and by the Federal Courts in cases in which the validity of the process has not been questioned.

It is therefore contended that the process in question is analogous to the summary process against a defaulting collector by distraint warrant under an act of Congress, attacked as in violation of the fifth amendment, but held to be due process of law, upon the ground of settled usage in England and in this country, in the case already referred to of Murray, lessee, vs. Hoboken Land Company, 18 How. 272. In regard to this case, of which much use was made in argument, it may be observed, that the foundation for the usage was ascribed to imperative necessity, which formed a distinction between official claims for public taxes and all others in the method of their enforcement. 18 How. 282. It may also be observed that the usage found to be due process of law in that case, was not only an ancient, but a uniform consistent usage. There is nothing in the report to indicate any conflicting usage. It is further to be remarked, as a matter of fact, although the decision is not put upon that ground, that the collector in that case had voluntarily accepted office under an act of Congress providing summary process in case of his default, suggesting analogies with the case of tenants voluntarily entering into that relation, under distraint laws in force with general warrants of attorney to confess judgment upon a future default, with the case of mortgagors under statutes consenting to decrees being taken against them for a default; and with the case of sureties under statutes authorizing judgments against sureties

upon appeal bonds in case of affirmance, thus in effect making themselves voluntary parties.

16 Wall 535, 17 Wall 423, 119 U. S. 389, 124 U. S. 510, Cooley, Con. Lim. (623) 497.

In the several particulars mentioned it will be found that the case at Bar is distinguishable.

Another case relied upon on that side is Hurtado vs. California, 110 U. S. 516, involving the question whether the words "due process of law" in the fourteenth amendment necessarily require an indictment in a capital case, the Constitution of California having authorized such prosecution by information, without the intervention of a grand jury. After an exposition of the phrase "due process of law" as identical in substance with the phrase "law of the land" in Magna Charta, the Supreme Court takes occasion to cite from the case of Bank vs. Oely, 4 Wheat 235, 244, the following proposition: "As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: That they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of. private right and distributive justice." The Court then comments upon the language cited above from the opinion in Murray vs. Hoboken, 18 How., and furnish the real syllabus of the passage as follows: "That a process of law, which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usuaged both in England and in this country, but it by no means follows that nothing else can be due process of law. The point in the case cited arose in reference to summary proceeding, questioned on that account, as not due process of law. The answer was, however, exceptional it may be, as tested by definitions and principles of ordinary procedure, nevertheless, this, in substance, has been immemorially the law of the land, and therefore is due process of law. But to hold that such a characteristic is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our juris-

prudence, the unchangeableness attributed to the laws of the Medes and Persians."

This case is cited to sustain the position that there may co-exist under the same system of jurisprudence, two distinct and different procedures to accomplish the same end, and yet each may be due process of law.

If information may co-exist with indictment then it is argued by parity of reason, condemnation *ex parte* may co-exist with condemnation upon notice. The proceeding by information challenged in that case, was introduced by a provision in the Constitution of California. The proceeding challenged in the case at Bar depends for its validity upon settled usage. The case cited throws no light upon the question how far such usage to be called a settled usage must possess the attribute of universality and uniformity, how far it may be gradually weakened and impaired by non-use or by a contrary use, how a legislative usage in private acts of incorporation of a certain limited class compares with conflicting public legislation, and what effect is to be given to either in the construction of a constitutional provision *in pari materia*.

Upon the other hand, the case last referred to also sustains the position that a State constitution is open to challenge and cassation from the standpoint of the Federal Constitution, upon the question of whether any of its provisions may violate the guaranty of due process of law.

And from the two cases together (18 How. and 110 U. S.) the proposition is deducible:

1. That, in general, due process of law is to be tested by the fundamental principles of right and justice guaranteed by Magna Charta, the State Declaration of Rights and the Federal Constitution.

2. That summary proceedings, inconsistent with those principles, may yet be sanctioned by immemorial uniform usage in exceptional cases.

3. But no usage, however settled, can be due process of law if found to be in conflict with any provision of the Constitution forbiding it.

The bearing of these propositions will appear further on.

The last of these propositions is analogous to the common law maxim, pertinently illustrated by Littleton. He puts the case of a manorial custom, contrary to one of the first principles of natural justice, the principle that forbids a man to be both party and judge. "Such prescription, or any other prescription used, if it be against reason, this ought not, nor will not be allowed before judges; *quia malus usus abolendus est.*"

Litt., Sec. 212.

The same maxim is illustrated in reference to a usage contrary to the principle of justice invoked in this controversy, the principle *audi alteram partem*. An immemorial practice of an inferior Court to proceed to judgment when the defendant has not duly appeared to the suit has been held illegal and void.

Williams vs. Bagot, 3 B. & C. 772; 5 D. & R. 719; 3 Chit. Prac. 142.

Before looking at the other side of the statutory question, it may be instructive to note the difference in the historical development of the writ of *ad quod damnum* into eminent domain legislation, as shown in England and in this Province, about the same time. In 1697 Parliament passed "An act for enlarging common highways," which is spoken of as the earliest statutory application of the same writ.

Finlason's note, &c., 2 Reeves 534.

This statute enacts as follows: "And that no person may be surprised by the power contained in this act, but may have timely notice to appear," the justices "shall issue out their precepts to the owner or owners of the ground or others interested in the same, to appear," &c.

8 & 9 W. Ill. c. 16, sec. 3.

It was not until a century later that the same principle of justice began to be adopted in Maryland in connection with its eminent domain legislation. The reasons which delayed its adoption here are sufficiently obvious. In a new country land has little or no value. Improvements are everything. Everybody is supposed to want a mill on his stream, a road through his land, or a town site at his front door. To take a man's land, even behind his back, in the comparatively small quantity needed for such improvements, is not supposed to be doing him an injury, but a favor, and the question of money compensation is under such circumstances a matter of nominal damage.

As the new country becomes settled, as towns and cities begin to appear, land appreciates in value, and more importance is attached to the rights of the owner. Towards the close of the last century quite another system of legislation than that heretofore mentioned, but *in pari materia*, begins to develop.

Condemnation acts are from time to time passed containing more or less explicit requirements for notice to the land owner. Sometimes personal notice is required (1792, c. 37; 1793, c. 41; 1793, c. 66).

Sometimes notice by publication (1792, c. 27; 1798, c. 19; 1783, c. 22; 1784, c. 39; 1789, c. 45; 1785, c. 32; 1799, c. 70; 1891, c. 54).

Sometimes notice both actual and constructive is provided for. (1796, c. 69; 1797, c. 65; 1794, c. 70).

And in some cases where no notice at all is required in the statute, the rights of infants and others under disability are carefully reserved. (1793, c. 54; 1798, c. 37; 1795, c. 13; 1795, c. 19; 1799, c, 81.)

In the method of the acts cited, and many others like them, we note a radical departure from the old *ex parte* system. One reason for it has been already suggested. Another may be found in the awakening of the public mind to fundamental principles and absolute rights, natural to a generation which has lately passed through an era of revolution and constitution making. But whatever the causes the phenomenon exists. Condemnation acts requiring notice increase in frequency with the opening years of the present century. It is true that condemnation acts framed upon the old *ex parte* model appear side by side with them. It must also be admitted that among these latter are to be found the charters of large and important corporations. The current of legislation does not altogether quit its ancient channel. But it divides, and the division persists.

The old use gradually weakens as its uniformity is destroyed.

We now come down to the important legislation of 1817 and 1818. The city of Baltimore has been incorporated, and is rapidly growing. Other cities and towns are beginning to assume proportions. The people have become tired of the chaotic condition of their highway laws. Heretofore enabling acts have been passed for particular roads and particular counties. Some have required notice, others have not. The time has now come for the legislature to establish a general and permanent road system for the whole State. Two methods of condemnation are before it, each illustrated by numerous examples, each claiming to be due process of law. One is *ex parte* and rests for its sanction upon usage only. The other is fair and just to both parties, and is bottomed upon principle as well as usage.

In this state of the question a public general act is passed "to regulate the manner of obtaining and altering public roads in this State." 1818, c. 89. This statute bears a striking family likeness to a Virginia statute of the preceeding year. Commissioners are to determine whether the road be needed. Before they proceed, they are to give "fifteen days notice to all the parties concerned." Upon the return of the commission to Court, either party is "entitled to a trial by jury, and the issue or issues shall be framed by the Court so as to bring the matter in dispute between the parties fairly to trial, whether the same shall relate to the location of the road or the ascertainment of damages by the commissioners." Worcester County alone is excepted from the operation of this act. The fifteen days notice was enlarged to thirty by 1829, chap. 238.

1 Dorsey Laws, 687.

The year before a public local act had been passed "relating to the city of Baltimore," not requiring notice, but authorizing an appeal from the valuation of assessors of land taken for opening streets to Baltimore County Court, and giving the right to a trial by jury upon issues framed by the Court.

1817, c. 148, sec. 16.

2 Dorsey's Laws, 1444.

By a supplementary act, notice of sixty days before proceeding was required to be given by advertisement, and the appeal was changed to Baltimore City Court.

The case of public roads having been provided for, the same method was subsequently applied to all private roads or ways, by a public general act, from which no county was excepted. A preliminary notice of ten days is re-

quired to be given "to the parties through whose lands the proposed road or way is to be located"; an appeal is authorized to the County Court, and a "trial by jury" at the election of either party.

1834, ch. 253; 2 Dorsey's Laws, 1177.

These public laws and their supplements were all in force at the time of the adoption of the constitution of 1851, which introduced a new prohibition, not found in the constitution of 1776, in the following words:

"The General Assembly shall enact no law authorizing private property to be taken for public use without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation."

"Art. III, sec. 46.

The same prohibition is contained in the succeeding constitution of 1864 and 1867 (Art. III, Sec. 40), and it is claimed on behalf of the plaintiff that the jury therein referred to means a common law jury, with the judicial incidents thereto belonging, especially notice, opportunity to be heard and to summons witnesses. Upon the other hand, it is contended on behalf of the defendant, that no new principle or method of procedure was contemplated by the provision, which was simply declaratory of existing law, and that the word "jury" as there used means or at all events includes in its meaning the sheriff's special juty, the *ex parte* jury of inquisition of immemorial usage.

If the word "jury" be collated with the same word as used in other clauses of the constitution, it means a trial jury, and if it means anything else in this clause it is the only place to be found when it does mean anything else than a trial jury. Again, if the word "jury" be collated with the same word as used in system of public legislation applicable to the public and private roads of the State, including the streets of the City of Baltimore, it means a trial jury. But if the word jury be collated with the same word as used in certain charters special acts of incorporation of particular, not all, improvement companies, then it will have a meaning impressed upon it quite different from its import in other clauses of the constitution, and in the road and street condemnation public general and public local acts.

The question is thus presented in what sense did the people who adopted the constitution understand this word "jury?" With which of the two condemnation systems were the people most familiar? Of which set of acts are they to be presumed to be cognizant? What authority is there for imputing to the people at large that knowledge of the details of special and private acts of incorporation which they are presumed to have of public laws, and which as matter of fact they actually had of their road laws? Even Courts are not presumed to know these special enactments. They must be pleaded and offered in evidence. All men are theoretically presumed to know public laws; and practically most men do know their own road laws. Road laws are permanent as well as general. They affect the entire population all the time. Railroad and other corporation condemnations are of temporary execution and limited range. Not only so, the *ex parte feature* of these special laws has been masked, not designedly, but effectually from public observation. It has been already seen that it is an established rule of practice to give notice, although the law does not require it. Even along the line of a railroad where condemnations have been made, under one of these special acts, the people are not thoroughly educated. How then can it be said that the people who adopted the constitution understood the word "jury" in the special and technical sense, and not in the common and popular sense?

There is another consideration. There is not a change made by the Constitution of 1851 which was not supposed to be in the direction of progress and reform. With the exception of a single prohibition, which stands upon grounds so peculiar that it cannot be drawn into this discussion (Art. III, Sec. 43), there is not one reactionary provision to be found in the entire instrument. There would be a notable one if the word "jury" in this clause were construed to mean an *ex parte* jury of inquisition. To construe it thus would be in effect to declare all the street and road public general and local legislation carefully providing for notice, appeal, trial by jury, not of course unconstitutional, but extra constitutional, superfluous and nugatory.

Agreeing therefore with the defendant's counsel that the provision is declaratory, the question comes back, declaratory of what? The answer is clear. Declaratory of that principle most firmly established by public legislation, and of that procedure most familiar to the people at large.

To make it declaratory of anything else would give the provision a reactionary instead of a progressive operation; would march it backward rather than forward, and would place it in conflict with every other characteristic of the constitution, and with its whole scope and spirit.

Can it be for a moment supposed that the intention of the framers of the constitution and of the people who adopted it was to perpetuate an invidious discrimination in favor of private companies as against the public in the exercise of the eminent domain? Is it common sense or common justice to invest private corporations with absolute power to condemn *ex parte*, when that power is denied to the City of Baltimore and to the counties of the State? Let us suppose the very question to have been asked the average voter, "What is the understanding of this word jury?" How many of them would have replied, "I understand by it a sheriff's jury of inquisition under an *ex parte* proceeding? How many of them would have replied, "I understand by it the permanent recognition for all future time of the principle and practice of condemnation without notice?" How many of them would have replied, "I understand by it an expression of unlimited confidence in the fairness of all private corporations, which unfortunately cannot be placed in those agencies which represent the public?" On the other hand, how many voters may naturally be supposed to have replied, "What do I understand by this word jury? Why, the same as any other jury, with a fair show for a square stand-up fight?" These questions answer themselves.

Construing this provision upon the same principle of interpretation applicable to other constitutional provisions, with reference to the context, the subject matter, the *usus loquendi* of the constitution itself and cognate legislation, and the presumed intention of the delegates who framed and the people who adopted it, it is manifest that the natural and popular acceptation of the word "jury" as used in public general laws for the condemnation of public and private roads throughout the State, and in public local laws for the condemnation of streets in the city of Baltimore, is the true sense in which that word is used in organic law. That sense imports a *trial jury* and its necessary and ordinary judicial incidents. Of these incidents, the most essential and peremptory are notice and opportunity to be heard.

Cooly Cons. Lim. 563 (4 p. ed.).

Lamb vs. Lane,, 4 Ohio State 176-177.

As to constitutional interpretation.

State vs. Mace, 5 Md. 337; Manly vs. State, 7 Md. 135; Bandel vs. Isaac, 13 Md. 223; Billingsley vs. State, 14 Md. 369.

In one of the first condemnation cases which arose under the constitution of 1851, an unsuccessful attack was made upon one of the street opening acts heretofore referred to (1838, ch. 226) and upon a city ordinance passed in pursuance thereof. These enactments were claimed to be in violation of the same clause already quoted (Cons. of 1851, Art. III, Sec. 46), because they provided for a preliminary valuation by commissioners, instead of a compensation to be "awarded by a jury."

It was also claimed that the preliminary notice by publication required by the act of proposed condemnation was defective. The court after disposing of the latter objection went on to decide that inasmuch as the owner had the right of appeal from the assessment made by the commissioners and was secured a *trial by jury* before the appellate tribunal, the enactments assailed were constitutional and valid. Statutes enlarging the jurisdiction of justices of peace and cases in other States deciding that the right of trial by jury was preserved inviolate under such statutes by the right of appeal were considered analogous. After the citation of such cases the court proceed to say:

"These cases fully establish the principle that when a law secures the *trial by jury* upon an appeal, it is no violation of a constitutional provision for *guarding that right*, although such law may provide for a *primary trial* without the intervention of a jury. This is upon the ground that the party, if he

thinks proper, can have his case *decided* by a jury before it is finally settled."

Steuart vs. Baltimore, 7 Md. 500, 512.

It is noticeable that the court in using this language cannot help reading into the constitution the word *trial* alongside of word "jury." The two expressions are parts of the same conception. It was not only natural but necessary thus to connect the idea of "trial" with the term "jury," because the act then before the court, as well as the other public acts in *pari materia* heretofore referred to were all in force at the time the constitution was made and adopted, and, as has already been attempted to be shown, must be presumed to have been in the contemplation of both the framers of the constitution and of the people who adopted it, and in all those public laws the words "jury" and "trial" were uniformly coupled.

The constitutional provisions in question, say the court, was a "provision for guarding that right." What right? The right of "trial by jury." Obviously, we are not to confine the scope of this language to the trial "upon an appeal." That was but an accidental variation, due to the special circumstance, that in that case the preliminary valuation had been made by commissioners. The essence of the decision is, trial by jury, at some stage, is the right guarded, if not *in limine* then, at all events, on appeal.

The foregoing is the only case in which the Court of Appeals has been called on to consider the constitutional provision in question with special reference to the term "jury" as used therein. Although not an express adjudication in point its authority sustains indirectly, the construction indicated by principle.

"As agreed upon between the parties or awarded by a jury." Taking the whole clause together, there is nothing in it which looks like a unilateral proceeding. The idea of mutuality is the central and conspicuous figure exhibited in the words "between the parties." These words spring from a conception of equality, impartiality and evenhanded justice, and out of the same conception immediately spring the words "awarded by a jury." "Award" is not a term of unilateral import. Its most familiar popular sense

is cognate with its technical sense, and both import an arbitration of some sort. No matter what the character of the tribunal whose proceedings result in an award, whether forensic or conventional, absolute equality of position and equality of right between the competitors as to every incident which may influence the tribunal and affect the award is known of all men, to be indispensable. An *ex parte* arbitration resulting in an *ex parte* award is as unknown in the market place as in the courts. The word is not ascertained but "awarded." The phrase is not "ascertained by inquisition," but "awarded by a jury."

When we turn to the legislation of the first decade after the adoption of the constitution of 1851, it must be admitted that it throws but a dubious light upon the inquiry. The same mixed character pervades this entire mass of unsystematic legislation since that time. It exhibits anything else than that "constant, long and uniform" interpretation of the constitution, either on one side or the other, contemplated by the authorities.

1 Md. 369; 21 Wall 162, 178.

So far, however, as the railroad charters alone are concerned, it is noticeable that the first General Assembly after the adoption of the constitution laid the foundation for a uniform interpretation by an unbroken series of condemnation acts explicitly requiring notice. At the next session the first break was made by the act incorporating the Eastern Shore Railroad Company, 1853 c. 84. The precedent thus set must in a measure be held responsible for the partial drift in the opposite direction. Upon looking at the names of the corporators there will be found among them some of the leading lawyers in that section of the State. It was natural that a charter taken out by such men as John S. Crisfield, John R. Franklin, George Vickers, John C. Groome and James A. Steuart should have been followed by many as a sound precedent. It was unfortunately a misleading, precedent, as was afterwards practically confessed by a supplementary act providing for a caveat in the Circuit Court of the county, the compelling of an appearance and a trial by jury and the service of notice upon the guardian or committee of an infant or *non compos mentis* or

the appointment of guardian *ad litem* and notice by publication against non-residence (1860 c. 59). An admitted error upon deliberate reconsideration of so vital a character entering into the line of precedent at its source detracts from it much of the weight that might otherwise be claimed.

Reliance is placed by defendant's counsel upon several decisions of the Court of Appeals as recognizing the validity of charters granted since 1851 with the *ex parte* condemnation feature.

Balto. & Potomac R. R. Co. vs. Maynard, 34 Md. 87.

W. Md. M. Co. vs. Patterson, 37 Md. 125.

Georges Creek Co. vs. New Central Co., 40 Md. 425.

In none of these cases was the question of constitutionality raised. In none of them was the Court's attention called to any of those considerations which have so prominently entered into this controversy. If observations may be found in the course of any of these opinions in conflict with the views now held at Annapolis upon the question of notice as indispensable to due process of law, they must now be regarded as overruled by the tax cases.

Much stress is also laid upon the language of the court in State vs. Graves, 19 Md. 351, 369, which is referred to as recognizing the jury summoned upon warrant in the nature of an inquest *ad quod damnum* as a jury equally constitutional with the jury obtainable on appeal under road and street condemnation acts. That case was a mandamus to compel the city authorities to proceed with the opening of a street, and was brought in the interest of a party who was benefited by the proposed opening, and complained of being materially injured by the repeal of the ordinance, and the abandonment of the contemplated improvement. The question was whether this private interest should control the policy of the city. The very condemnation act before the court was the act of 1838 which required notice and authorized a jury-trial upon appeal. The court in assimilating the proceeding to an inquest *ad quod damnum* designed merely to point out its inchoate and contingent character. The court had no reference whatever to the ex parte feature of the old writ of *ad quod damnum*. Nor did the court mean to intimate that a legislative condemnation founded upon that writ must necessarily be an *ex parte* proceeding. That such is not the case, appears distinctly from the language of the same judge in a much later decision:

"Inquisitions, as is well known, are commenced by warrant issued by a justice of the peace to the sheriff of the county, who is required to summon the jurors, *notify the proprietors*, swear the jurors and witnesses."

Mayor vs. Ritchie, 51 Md. 243, 4.

Indeed, it is a conclusion to be drawn from the historical investigation of this condemnation process that its essential nature is not to be found in its crude origin, but in its mature development. The true process is not the process in embryo, in a rude, uncivilized age, under an arbitrary feudal government; nor are we to regard its character as unalterably fixed because its rough method was found adapted to the primitive conditions of a new unsettled colony. Like every other archaic institution, it has improved and developed with advancing civilization. "The natural development of everything is properly its end. For that which is the character of each thing when its growth is fully completed, that, we say, is its true nature, as in the case of a man, a horse or a house."

Aristotle Politics, Book I, ch. 2.

It was not of the essence of the *ad quod damnum* process that it should be *ex parte* any more than it is of the essence of a locomotive that it should have the awkward levers of the old grasshopper engine. Originally conceived in the interest of the crown, like other feudal devices, the writ of *ad quod damnum* went straight to its mark, crashing every obstacle, and trampling upon the rights of the subject. The people who in this country have succeeded the crown, and in this State the proprietary, following the example set by Parliament after the Revolution of 1688, have by their public highway legislation exhibited the true modern type of the old *ad quod damnum* process, shorn of its oppressive, and arbitrary features, and assimilated to other institutions of a free country and an enlightened age. Such a process is due process of law. In the struggle between a lingering survival of feudalism and the "spirit of personal liberty and individual right," the

latter must ultimately prevail, since it is embodied in every constitutional muniment.

An important question is raised in the answer as to the validity of titles acquired by railroad and other corporations under the process in controversy. Without seeking to minimize difficulties, and fully realizing that the nature of this litigation is such that whichever way it is determined the court will have to face a choice of evils, there is yet something to be said to allay apprehension on this score. It has already been seen that although no provision is made for notice in this class of enactments, the established practice under them is to serve notice upon the proprietor whenever practicable. And whether served or not, the fact is, and as a fact it was made available by defendant's counsel in another branch of their argument, that in a great majority of cases the land owner has actually participated in the proceeding, and that as a general rule few cases are more hotly contested than condemnation cases when the values are considerable. In all such cases of voluntary appearance the objection would be waived and the party bound.

Great Falls vs. the Attorney-General, 124 U. S. 593, 599.

The owner would also be bound by acceptance of the condemnation money, whether he participated in the proceeding or not, and although the proceeding was invalid.

Long vs. Long, 62 Md. 71, 72.

Stewart vs. Mayor, 7 Md. 515.

The cases not closed upon the foregoing principles or by adverse possession, would in all probability be found to be few in number. Still, it must be admitted that it is not a comfortable prospect for corporations if any there be, conscious of having taken undue advantage of helpless or absent owners under the opportunities afforded by these *ex parte* acts, to be placed upon the defensive. It is not to be presumed that such undue advantages have been taken. If loss should ultimately have to fall upon any of them, they will at least have respectable company. Upon the faith of the decisions overruled in the Ulman case, the city of Baltimore had expended large sums in improvements, the greater part of which the taxpayers were compelled to lose by

their reversal, as stated in the minority opinion.

72 Md. 602.

No principle of justice or policy has been suggested upon which the court should discriminate in favor of private corporations as against the public at large. The same measure of even-handed justice should be meted to both.

Finally it is urged upon the court that in view of all the foregoing difficulties combined, the mixed character of legislation before and since the constitution of 1851, the tacit judicial recognition of the validity of the process and the possible disturbance of titles, contingent upon its declared invalidity, the ordinary principle that a statute should not be held unconstitutional except in a clear case, applies here with extraordinary force. It is impossible, say the defendant's counsel, to deny that at least a fair doubt exists as to the unconstitutionality of this act, and if a doubt exists, that doubt must at once be resolved especially by a subordinate court in favor of the statute.

It is at this point that the discussion is brought within the range of the Federal Constitution, as expounded by recent decisions. The latest and most authoritative of these decisions, so far as this court is concerned, is the case referred to at the outset, the opinion in which begins by announcing that "the identical question arising on the record now before us has been passed on by this court on several occasions, but is now presented distinctly as a Federal question," and, after referring to the results reached in the four cases overruled, adds that the municipal legislation which was sustained in those cases is now assailed upon the ground that it not only violates the Declaration of Rights of Maryland, but likewise the 14th amendment to the Federal Constitution. 72 Md. 589.

There can be but one meaning to this? The prohibition of the Federal Constitution, "nor shall any State deprive any person of life, liberty or property without *due process of law*," is an external interdict upon the States. "Due process of law" is not exclusively dependent for its definition upon State usage, State laws, or even State constitutions.

In the 14th amendment it refers to that law of the land in each State which derives its authority from the

inherent and reserved powers of the State, but exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our institutions. Hurtado vs. California, 110 U. S. 535.

"It is a rule founded on the first principles of natural justice, older than written constitutions, that a citizen shall not be deprived of his life, liberty or property without an opportunity to be heard in defense of his rights, and the constitutional provision that no person shall be deprived of those "without due process of law" has its foundation in this rule. This provision is the most important guaranty of personal rights to be found in the Federal or State Constitution. It is a limitation upon an arbitrary power, and is a guaranty against arbitrary legislation. No citizen should arbitrarily be deprived of his life, liberty or property. This the Legislature can not do, nor authorize to be done. Due process of law is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty or property, whether the proceding be judicial, administrative or executive in its nature. This great guaranty is always and everywhere present to protect the citizen against arbitrary interference with these sacred rights."

Earl J., in Stuart vs. Palmer, 74 N. Y. 183, cited and adopted in 72 Md. 593.

Consistently with these views, a provision in the constitution of the State of California has been held repugnant to the Fourteenth Amendment and void, in a Federal Circuit Court decision which has never been reversed.

County of San Matoe vs. R. R. Co., 8 Sawyers 238.

The leading opinion in this case was pronounced by Mr. Justice Field of the Supreme Court of the United States, and concurred in by the Circuit Judge Sawyer. The clause invalidated related to the assessment of railroad corporations, and failed to provide for notice to the owner. Upon that ground the State Constitution was held to violate the Federal Constitution, as in conflict with the guaranty that no one shall be deprived of his property without due process of law. The Maryland case referred to is strictly in line with that decision, in recognizing the Fourteenth Amendment as a power *ab extra*. If the Constitution of California can be held unconstitutional from a federal standpoint, so can the Constitution of Maryland. If a provision for notice was indispensable to the validity of the former, it is equally so the validity of the latter. Both contemplate the taking of property, the one indirectly, through the taxing power, by the imposition of a lien; the other, directly, through the power of eminent domain, by the immediate seizure of the property itself, without circuity, and by the acquisition of absolute title.

In the present case, let us say that from a Maryland standpoint the court is embarrassed by a doubt as to the true construction of the words "awarded by a jury" in the State Constitution. The opposing considerations which press upon the judicial mind have been reviewed. But one remains, and it is this: If the word "jury" be construed to mean the common law jury familiar to the daily life of the people in their courts of justice, and in their public laws for condemnation of roads and streets, it brings with it into the Constitution its common law atmosphere of equality of right as to every judicial incident, notice especially included. Such a construction is beyond all doubt consistent with the Federal Constitution. Such a jury-trial is beyond all doubt due process of law. But if the word "jury" as used in the State Constitution be construed in a more special and technical sense to mean, or to include in its meaning, the simulacrum of a jury, the *ex parte* inquisition jury of one class of private acts, with a commanding air of feudal oppression and the close smell of the dark ages about it, then such construction arrays the provision in direct conflict with the Federal Constitution, as interpreted by authority absolutely binding upon this court. Such a taking of property behind the owner's back is not due process of law as defined by those authorities.

To this method of reasoning counsel for defendant object as "dovetailing" the Fourteenth Amendment with the State constitution, and thus enlarging the scope of each. They contend that the argument is not advanced by the Fourteenth Amendment, inasmuch as due process of law is process according to the law of the land, that this process in the States is regulated by the

law of the States (Walker vs. Savint, 92 U. S. 90), and that at last the discussion drifts back to the law and usage of Maryland. The answer to this again is furnished by the same decisions so often appealed to. If the discussion drifts back to the law of Maryland, the law of Maryland is the law as last laid down by its appellate court. A taking of property without notice to the owner is a taking without due process of law. Such is the broad principle of the tax cases, stronger, more obvious, more direct and immediate in its application here than it was there. As stated in the outset, there is no escape from the grasp of those adjudications.

The word "dovetailing" is a graphic metaphor, and belongs to the domains of rhetoric. It may be conceded that the operation of the Fourteenth Amendment is cumulative only, and that it simply reinforces the Declaration of Rights. But it does so with the combined power of forty-four States. If resort may be pardoned to a similar method of illustration, there is the same current over the old line, but the dynamo is larger and the voltage heavier. With that explanation one can understand the history of the tax assessment cases. Without it, they are an enigma.

The truth is, the usage of condemnation without notice to the owner has always been an anomaly in our State jurisprudence. The conditions which alone made it tolerable have long ceased to exist. It never has been defensible upon principle, and is warranted by no imperative necessity. As a use, it had already lost uniformity by the growth alongside of it of a condemnation system with notice, when it was practically superceded by the adoption of that improved system for public highways throughout the State.

After long and familiar acquaintance with this preferred system, the people had submitted to them a new constitution, which professed to be a reform in all its new departures. It contained an entirely new provision for the exercise of eminent domain. It conditioned compensation to be "awarded by a jury." A question is now made as to the use in which the people accepted these words. On the one side, we find an unquestionably legitimate use, based on principles of justice secured by the Maryland Declaration of Rights. There

is but one construction of the words "Awarded by a jury," consistent with those principles and that use. On the other hand, an ancient surviving usage is appealed to for the purpose of shutting off those principles. Is the new constitution to be interpreted in the light of principles declared on its faces and of a usage consistent with them, or by a less general and less familiar usage repugnant to principle? That is the question for the court to determine, and while the judicial mind is in suspense, reluctant to raise or meet an issue with the legislative branch of the government, unwilling to disturb an existing situation and shrinking from the grave responsibility involved, the weight of the Federal Constitution is thrown into the scale upon the side of principle and of the usage consistent with it. It is not the Federal Constitution as construed by this court only that it is thus decisive of the question, but as interpreted by the Court of Appeals of Maryland.

The conclusion is inevitable. Conceding that the Maryland Constitution is susceptible of two constructions, and that doubt exists as to which of the two is the correct one, the doubt instantly vanishes the moment it becomes apparent that one construction is in conflict, and the other in conformity with the Constitution of the United States, as already construed by the State court of last resort. Upon this principle there should be no hesitation in holding that the words "awarded by a jury" in the Maryland Constitution are to be taken to require a regular trial jury, or its substantial equivalent, at some stage of the process of condemnation, either in limine, or upon appeal, and that means a jury with the ordinary judicial incidents of notice, fair, adequate and sufficient, of the precise time and place of the meeting of the jury, opportunity to strike, opportunity to summon witnesses, and opportunity to be heard, and inasmuch as the 167th section of Article 23 of the General Code fails to provide these indispensable requirements, the condemnation process therein prescribed is a direct taking of property without due process of law, and is for that reason and to that extent unconstitutional and void.

In addition to the cases cited the following authorities will be found more or less in point:

Boom Co. vs. Patterson, 98 U. S. 404.

Huling vs. R. R. Co., 130 U. S. 559.

U. S. vs. Jones, 109 U. S. 519.

Chicago, &c., R. R. vs. Minnesota, 134 U. S. 418.

Davidson vs. New Orleans, 96 U. S. 97.

Hagar vs. Reclamation District, 111 U. S. 701.

Burns vs. Multnomah, 8 Sawyer 557, 552.

Cooley Cons. Lim., 563.

Lewis Em. Domain, sec. 365.

Elliot Roads and Streets, 150, 152.

Attention is also to be given to a remarkable concession in one of the cases cited contra.

Wilson vs. B. & P. R. R., 5 Del., Ch. 547.

The preventive relief of injunction is prayed for in the bill and is the appropriate remedy in such cases. A decree will be signed to that effect. If temporary inconvenience is to result, it is greatly to be regreted, but unsettled questions have no pity for the repose of communities. It is a lesson taught by the lax litigation that elementary questions of absolute right are never settled until the settlement is based upon sound constitutional principle.